**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

| | |
|---|---|
| **VERTEX PHARMACEUTICALS** | ) |
| **INCORPORATED,** | ) |
|         **Plaintiff,** | ) |
| | ) |
| **v.** | )       **Civil Action No.** |
| | ) |
| **BETTY KRITIKOS and** | ) |
| **GILEAD SCIENCES, INC.,** | ) |
|         **Defendants.** | ) |

_____)

## COMPLAINT

Plaintiff Vertex Pharmaceuticals Incorporated ("Vertex"), by its undersigned counsel, brings this action for temporary, preliminary, and permanent injunctive relief as well as for monetary damages, upon knowledge with respect to itself and its own acts and upon information and belief with respect to all other matters, as follows:

### NATURE OF THE ACTION

1.      As more fully described below, this action arises out of Defendant Betty Kritikos's ("Kritikos") breach of her contractual, statutory, and common law obligations to Vertex; her resignation from Vertex and reported intent to commence employment on April 1, 2013 in a directly competitive position with Defendant Gilead Sciences, Inc. ("Gilead") (in breach of the above-referenced obligations); and Gilead's breach of its statutory and common law obligations to Vertex.

2.      Kritikos began working for Vertex on November 4, 2007.  On March 13, 2013, she announced her decision to resign effective March 29, 2013.   At that time, she informed Vertex that she will commence employment on April 1, 2013, at Gilead, in a position that is substantially similar to her Vertex role as Associate Director, Field Medical for Vertex's West

Region.  Based on the nature of the role that Kritikos intends to assume at Gilead, Vertex quickly

concluded that it could not continue to allow her to have access to its confidential information.

Based on this decision, Vertex contacted Kritikos by telephone at her home in Elmhurst, Illinois

(in the Central Time Zone) at approximately 10:30 a.m. Central Time on March 18, to (a) inform

her that Vertex would permit her to remain employed with Vertex through March 29, 2013 (the

date on which her resignation takes effect); and (b) require that she (i) immediately cease all

work for Vertex and (ii) promptly return all Vertex property (including documents and

information).

3.      Shortly after that discussion with Kritikos, Vertex arranged to have a courier

travel to Kritikos's home to collect all of the Vertex property, including documents and

information in her possession.

4.      At approximately 5 p.m. Central Time on March 18, 2013, Kritikos provided the

courier with the following items: a Lenovo Laptop computer (the "Vertex Laptop"); an iPad; a

Pocket Imager Visual Mobility; ThinkPad x200 Ultra Base; Lenovo DVD Mati IV – Data

Storage; Lenovo AC Adapter Power Cord; Lenovo AC Adapter Power Cord; Ink – HP88XL;

Lexmark; HP Printer; Vivera HP Inks; clipped paper entitled Clinical Trial Protocol – Version

1.0 6/20/08; Book entitled Lexmark 7100 Series – User Guide; Lexmark Printer; HP

Printer/Adapter; C8187-60034 #8121 – 1023; a Delta AC Adapter; and binders labeled as

follows:  (a) Fleet and Road Safety Policy; (b) Clinical Study Protocol 6/21/12; (c) Leading the

Change Vertex iPad User Guide; (d) Clinical Study Protocol 1/31/08; (e) Clinical Trial Study 1

of 13; (f) Field Medical Affairs for Reference Only – Investigation Brochure Version 12; (g) Pre

AASLD War Game, 10/29/11; (h) Leading the Change 2012 – Incivek National Planning

Meeting Leader; (i) Medical Background Telaprevir Posters and Presentation; (j) Telaprevir

Professional Speaker Bureau Training Meeting; (k) Leading the Charge Incivek June East/West Meetings 6/2012 Participant Guide; (l) Prove Protocols with memo on top to Liaisons from Tyke White 12/11/07; (m) Data Presentations CROI and EASL 2011; (n) All In! Leaders Guide Training Workshops for the Telaprevir P1 Launch Meeting; (o) Illuminate – CRA Investigation Meeting Binder – Study Number:  VX08-950-111  9/11/08 – 9/13/08; (p) Advance - Investigators' Meeting – The Adolphus Hotel 4/11 – 12/08; (q) Protocol for Study 106 and 107 – letter on top from Chris Barnes; and (r) Vertex Professional Speaker Bureau Training Meeting 2-11 – 12-11.

5.      After receiving these items, Vertex contacted Kritikos again to inquire about whether she had retained any Vertex property in her possession.  During an early evening phone call on March 21, 2013 at approximately 5:00 p.m., Kritikos stated that (a) she no longer had any Vertex property and (b) she had returned to Vertex all of Vertex's property and information.

6.      Although Kritikos represented to Vertex on March 21, 2013, that she had (on March 18) returned all of Vertex's confidential information and property, this representation conflicts with the evidence revealed by a cursory forensic evaluation of the Lenovo Laptop computer that Vertex supplied her for the limited purpose of conducting business as a Vertex employee (hereafter, the "Vertex laptop").

7.      For example, the forensic analysis of the "Vertex Laptop" shows that on March 18, between 10:37:45 a.m. and 3:49:09 p.m. Central time, Kritikos attached at least 10 different confidential Vertex documents to email messages that she sent out using her personal email addresses (betty.kritikos@yahoo.com).  That forensic analysis also revealed that she attached a myriad of other confidential Vertex documents to email messages that she sent from her personal Yahoo email after Gilead began recruiting her in early November 2012.  In addition, the forensic

analysis revealed that she attached at least ten (10) portable storage devices, or USB drives, and at least one (1) external hard drive to the Vertex laptop between November 1, 2012 and March 18, 2013.

8.      Notably, Kritikos (a) attached Vertex confidential documents to emails that she sent from her personal yahoo account; (b) retained drives that are designed to store electronic information contain confidential Vertex information; and (c) agreed to commence employment with Vertex's direct competitor, Gilead, even though she agreed, when she commenced employment with Vertex, that she (i) would protect the confidentiality of Vertex's proprietary information and (ii) would not compete with Vertex for a period of one (1) year after her employment with the Company terminated.

9.      Thus, despite her clear contractual, statutory and common law obligations to Vertex, Kritikos has:  (a) accepted an offer of employment with Gilead, a direct competitor of Vertex in the field of liver disease treatments; (b) misappropriated Vertex's highly confidential information; and (c) breached her fiduciary obligations to Vertex.

10.     These acts constitute material breaches of the Employee Non-Disclosure, Non-Competition & Inventions Agreement (the "Agreement") that Kritikos signed at the commencement of her employment and reaffirmed in 2011 and 2012.

11.     Gilead, with actual notice of Kritikos's contractual obligations to Vertex, encouraged Kritikos to leave Vertex and join Gilead in a competitive position.

12.     In the past two months, two other Vertex employees have informed Vertex that Gilead is recruiting them to work for Gilead as Senior Medical Scientists in the Northeast United States.

13.     Accordingly, Vertex seeks damages and injunctive relief against Kritikos and Gilead (collectively, "Defendants") for (a)  Kritikos's breaches of contract, breaches of her fiduciary obligations to Vertex and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*; (b) Gilead's unfair and deceptive trade practices in violation of Mass. Gen. L. c. 93A and civil conspiracy; and (c) Defendants' intentional interference with Vertex's contractual and advantageous business relationships, misappropriation of Vertex's confidential information, violations of the Massachusetts Trade Secrets Act, Mass. G.L. c. 93, § 42, and other wrongful conduct.

## PARTIES

14.     Plaintiff Vertex is a Massachusetts corporation with its principal place of business located at 130 Waverly Street, Cambridge, Massachusetts 02139.  Vertex is a global biotechnology company that discovers, develops, and commercializes new medicines for serious diseases.  The U.S. Food & Drug Administration ("FDA") has approved two of Vertex's products, Incivek for the treatment of hepatitis C, and Kalydeco, for the treatment of cystic fibrosis.  Vertex markets and sells Incivek in the United States and Canada.

15.     Defendant Kritikos is a resident of the State of Illinois residing at 162 South Grace Street, Elmhurst, Illinois 60126.

16.     Although she has been informed that she is no longer required (nor permitted) to perform any work for Vertex, Kritikos remains employed by Vertex as an Associate Director, Field Medical for Vertex's West Region ("AD").  As an AD, she supervised a staff of eight (8) Medical Science Liaisons ("MSLs") who provide education to clinicians, researchers and other key opinion leaders ("KOLs") in the medical community.  Currently on paid leave, Kritikos will remain employed with Vertex through March 29, 2013.

17.     Defendant Gilead is a Delaware corporation with a principal place of business located at 333 Lakeside Drive, Foster City, California 94404.  Gilead is a global biopharmaceutical company that researches, develops and markets drugs for the treatment of HIV/AIDS, liver disease, and acute cardiovascular and respiratory conditions.  Gilead actively engages healthcare and sales professionals in Massachusetts, and markets its drugs throughout the Commonwealth.

18.     Upon information and belief, Gilead seeks to market and sell a new drug for the treatment of hepatitis C that will compete directly with Vertex's Incivek.  Publicly available information indicates that Gilead's competitive hepatitis C drug may be submitted to the FDA for approval by the end of the current fiscal year.  Indeed, Gilead is actively recruiting professionals to support its developing hepatitis C program throughout the United States, including in Massachusetts.  Gilead's recruiters or their agents have actively solicited Vertex's Medical Affairs and Commercial employees in support of Gilead's developing Hep-C program.

## JURISDICTION AND VENUE

19.     This Complaint seeks preliminary and permanent injunctive relief and monetary damages arising out of the events alleged herein.

20.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claim in Count IV arises under the laws of the United States and the Court has pendent jurisdiction over the state-law claims set forth in the remaining Counts.  This Court also has subject matter jurisdiction in this case pursuant to 28 U.S.C.  § 1332 because there is a justiciable controversy between the parties, who are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     Pursuant to Mass. G.L. c. 223A, § 3(a), (b) and (d), this Court has personal jurisdiction over Gilead, a foreign corporate Defendant, because Gilead, among other activities, regularly markets and sells its pharmaceutical products in Massachusetts and derives revenues from Massachusetts customers.  Additionally, these activities demonstrate sufficient, purposeful, regular, and systematic contacts with Massachusetts such that general personal jurisdiction over Gilead is proper.  Furthermore, this Court has specific personal jurisdiction over Gilead because, through its tortious conduct, Gilead stands to benefit from the confidential business and personnel information that Kritikos acquired through her employment with Vertex and through her continuous interaction, both in person and electronically, with Vertex colleagues in Massachusetts.

22.     Pursuant to Mass. G.L. c. 223A, § 3(a), this Court has personal jurisdiction over Kritikos because she has regularly transacted business in Massachusetts by virtue of her employment with Vertex, a Massachusetts corporation.  As a Vertex employee, Kritikos has relied on administrative services, support, management, and daily interactions with Vertex colleagues in Massachusetts to carry out her responsibilities.  She has been supervised by and reported to Vertex employees who work in Massachusetts.  She has routinely visited Vertex's Massachusetts headquarters to obtain training essential to conducting her job and to participate in presentations and preparations for corporate meetings.  In fact, she worked in Massachusetts eighteen (18) days in the last year alone.

23.     Kritikos's interaction with and reliance upon colleagues in Massachusetts and her routine travel to Massachusetts demonstrate continuous, systematic contact with Massachusetts such that this Court may exercise general personal jurisdiction over Kritikos.  Additionally, the Court has specific personal jurisdiction over Kritikos because the facts giving rise to the suit

arise directly out of her purposeful contacts with Vertex in Massachusetts. The Agreement at issue is governed by Massachusetts law, and Kritikos signed it before commencing employment with Vertex. Kritikos signed it again in Massachusetts on or about her first date of employment when she traveled to Massachusetts to participate in Vertex's new hire orientation program. In addition, the current confidential information, knowledge, and experience in the field of hepatology that Kritikos seeks to bring to Gilead (and that Gilead seeks to acquire from her) derives from her time spent at Vertex headquarters in Massachusetts and her daily interaction with Vertex colleagues who work in Massachusetts.

24.     Venue is proper in this district pursuant to 28 USC § 1391 because the Court has personal jurisdiction over both Defendants, the Agreement at issue contains a Massachusetts choice of law provision, and the subject matter of this case concerns the terms and conditions of Kritikos's employment relationship with Vertex as stated in the Agreement, which was agreed to and signed in Massachusetts.

## FACTUAL ALLEGATIONS

### *Kritikos's Employment with Vertex*

25.     Kritikos joined Vertex in 2007. At that time, she had very little experience working with hepatitis C therapies.

26.     She first executed the Agreement on October 30, 2007, before she started working at Vertex. She later re-affirmed her consent to the Agreement when she re-signed it on November 5, 2007, during her attendance at a new hire orientation in Cambridge, Massachusetts. A copy of the fully executed October 30, 2007 Employee Non-Disclosure, Non-Competition and Inventions Agreement between Vertex and Kritikos is attached hereto as Exhibit 1. A copy of the November 5, 2007 Signature Page is attached hereto as Exhibit 2. Attached as Exhibit 3 is a

blank, unexecuted version of that same Agreement, which Kritikos attached to email messages

that she sent from her Vertex computer via her personal email account

(betty.kritikos@yahoo.com) on February 28 and March 12, 2013.

27.     In consideration for Kritikos's agreement to be bound by the Agreement, Vertex

hired Kritikos, provided her with substantial compensation and fringe benefits, and allowed her

access to Vertex's confidential information.

28.     She commenced work with Vertex on November 4, 2007 as a Medical Science

Liaison II.  As stated in her offer letter, Kritikos received a substantial annual salary; a hiring

bonus; a monthly car allowance; additional compensation in the form of company restricted

shares and stock options; life, health and dental insurance; participation in the employee bonus

program, 401(K) plan and stock purchase plan; and four (4) weeks paid vacation.  *See* Exhibit 4,

October 29, 2007 Offer Letter.

29.     To protect Vertex's confidential and proprietary information, customer goodwill,

employee goodwill and business reputation, the Agreement contains restrictive covenants that

prohibit Kritikos from disclosing or using Vertex's trade secrets and confidential information,

working for direct or indirect competitors, soliciting business from current Vertex customers,

and/or interfering with Vertex's relationships with its employees.  *See* Exhibit 1.

30.     The Agreement defines Vertex's confidential information as:

> "(i) data or information concerning Vertex's business and
> technologies; (ii) Vertex's proprietary pharmaceutical
> compounds, processes, data and documentation; (iii) Vertex's
> proprietary computer, software, firmware, data
> documentation and information; (iv) Vertex's business
> methods and practices; (v) confidential, proprietary and trade
> secret information received from or otherwise relating to
> Vertex's customers, suppliers, consultants, collaborators or
> other third parties . . . (vi) information concerning the
> employees of Vertex; and (vii) any other information . . .

> which, if misused or disclosed, could have a reasonable
> possibility of adversely affecting the business of Vertex . . . ."

*See* Exhibit 1 at ¶7.1.

31.     Pursuant to the Agreement, Kritikos agreed that she would keep in "strictest trust

and confidence all Confidential Information of [Vertex] that is disclosed to [her] or created by

[her] or to which [she] ha[s] access."  She further agreed that she would not "use or disclose such

Confidential Information without the written consent of Vertex . . . ."  *See* Exhibit 1 at ¶1.

32.     She also agreed that upon the termination of her employment, she would

"promptly surrender to Vertex all copies, in whatever form, of Vertex's confidential information

in [her] possession, custody, or control, and [] will not take . . . any of Vertex's Confidential

Information that is embodied in a tangible medium of expression."  *See* Exhibit 1 at ¶ 2.

33.     Kritikos also acknowledged the unique nature of Vertex's business and Vertex's

need to protect its trade secrets and proprietary information, and she agreed that:

> "during the term of my employment with Vertex and for the period
> of one (1) year thereafter, I will not, directly or indirectly, for my
> own account or for any other person or entity, as agent, employee,
> officer, director, trustee, consultant, owner, partner or shareholder,
> or in any other capacity:
>
>> (i)      hire or attempt to hire or assist any other person in
>> hiring or attempting to hire any employee of Vertex; or
>>
>> (ii)     encourage or assist any other person in encouraging
>> any director, officer, employee, agent, consultant or any
>> other person or entity affiliated with Vertex to terminate or
>> alter his, her or its relationship with Vertex; or
>>
>> (iii)    encourage or assist any other person in encouraging
>> any customer, supplier, or other party with which Vertex
>> does business to terminate or alter its relationship with
>> Vertex; or
>>
>> (iv)     market or sell or assist any other person in
>> marketing or selling any product or service manufactured,

sold or under development by Vertex at the date of termination of [her] employment with Vertex; or

(v)     research, develop or manufacture or assist any other person in researching, developing or manufacturing any product or service that competes with any product or service conceived, manufactured, sold or under development by Vertex at the date of termination of my employment with Vertex."

*See* Exhibit 1 at ¶6.

34.     Kritikos further agreed that for a period of one (1) year, she would not

"accept employment with, advise, provide consulting services to, or acquire any interest in . . . any business that directly or indirectly competes with any product or services conceived, manufactured, sold, or under development by Vertex ***without first obtaining written consent of Vertex***. Vertex shall be permitted to withhold such consent in its sole discretion unless [her and her] prospective employer [] are able to provide Vertex with assurances reasonably satisfactory to Vertex that [she] will not be assisting the prospective employer in any of the prohibited activities listed above."

*Id.* (Emphasis added.)

35.     Kritikos's offer letter stated that "[a]s a condition of your employment, you will be required to sign a copy of our '*Non-disclosure, Non-competition and Inventions Agreement*' prior to your start date."  *See* Exhibit 4.  As noted above, Kritikos satisfied this condition before she started working for Vertex.

36.     Kritikos later affirmed her obligations under the Agreement on two occasions. She first did so on May 5, 2011, when Vertex promoted her to the position of Associate Director, Field Medical for the West Region ("AD").  Kritikos re-affirmed these obligations on July 26, 2012, when Vertex provided her with the opportunity to receive a substantial retention bonus in exchange for continuing to work for Vertex and complying with "[her] material obligations to

Vertex (for example, your obligation not to violate [the Agreement]) . . . ." *See* Exhibit 5, July 26, 2012 Letter re: Retention Bonus.

### *The Nature of Kritikos's Work as a Vertex Medical Science Liaison*

37.     Vertex hired Kritikos on October 29, 2007 as a Medical Science Liaison ("MSL").  MSLs are typically physicians, PhDs, nurse practitioners/physician assistants, or pharmacists who represent Vertex and the drugs it develops to "key opinion leaders" ("KOLs") and clinicians in the medical community.  KOLs are leading scientists, physicians, and faculty at major clinical, educational, and research institutions.  Clinicians are physicians, nurse practitioners, physicians assistants and other medical providers who use Vertex's products.  MSLs engage KOLs in scientific and medical interactions relating to Vertex's products and research initiatives.  MSLs are instrumental in providing practitioners and researchers with the expertise they need to properly use Vertex's products, and they provide information about Vertex products in development.

38.     MSLs are particularly valuable to both Vertex and KOLs because, unlike sales representatives, upon request, MSLs may in some circumstances respond to requests for information from Health Care Providers ("HCPs") on issues not expressly identified in product label labeling.  This could include information that is not publicly available.  Due to this aspect of their role, MSLs receive highly confidential information about current and future Vertex drugs.

39.     MSLs also help Vertex select KOLs from various regions of the country to conduct Vertex-sponsored clinical trials essential to (a) drug development and (b) acquiring required regulatory approval.  Based on their familiarity with KOLs in their territories, MSLs assist members of Vertex's research and development team to identify and recruit KOLs with the

appropriate expertise and facilities to conduct a specific trial.  Identifying the best KOL(s) for clinical trials requires narrowing the field of candidates, analyzing many different factors, and considering substantial amounts of confidential information because KOLs view clinical trials as a way to (i) advance knowledge and (ii) engage in the development of new and potentially groundbreaking treatments.

40.     As a result, MSLs must build and maintain relationships with KOLs.  Successful MSLs are credible, articulate, and highly knowledgeable about the drug they represent and the applicable field of medicine.  MSLs build these relationships over time through scholarly discussions, presentations to KOLs and their staff or fellow faculty, and other activities designed to establish a respected reputation within the field.

41.     When Vertex first hired Kritikos, she worked as an MSL supporting the Vertex drug Incivek.  She was assigned a field territory that included Illinois, Iowa, Missouri, Minnesota, Wisconsin, and Nebraska, and it was her job to establish and maintain relationships with KOLs and clinicians within those states.  To do this, Kritikos routinely met with KOLs in the field of liver disease ("hepatology"), provided seminars and presentations on Incivek or other Vertex research developments to KOLs and their staff and institutions, assisted in selecting KOLs to conduct Vertex clinical trials, and engaged in other activities aimed at maintaining a link between KOLs and the researchers and developers at Vertex in Cambridge.

42.     Before joining Vertex, Kritikos had minimal experience in hepatitis C. Accordingly, the knowledge and experience she has now, especially working with a marketed drug for hepatitis C, arises almost exclusively out of her work for Vertex.

43.     To engage KOLs at a high level, Vertex constantly provided Kritikos with the most current proprietary information about Incivek and other Vertex drugs currently in

development.  This included off-label information about Incivek that was not (and did not become) publicly available.  It also included the current status of clinical studies and new initiatives Vertex is planning for the future.

44.     Additionally, Kritikos learned confidential information about Vertex's marketing strategies, timetables for and locations of clinical trials and regulatory approval of drugs in development, and new KOLs that Vertex had targeted as future investigators or new contacts.

45.     In addition to expanding her contacts with KOLs as a Vertex MSL, Kritikos also expanded the substantive scope of her knowledge in hepatitis C.

46.     At Vertex, she also expanded her network of professional contacts to include clinicians (such as academic and community physicians, nurse practitioners, physician's assistants, and pharmacists) and public health groups for hepatitis awareness and testing.  At Vertex, she devoted approximately 75 percent of her time to clinician-oriented work.

47.     As a benefit of her three and a half years as a Vertex MSL, Kritikos enhanced her existing relationships in and developed new, strong relationships within the hepatology community in her territory.  These relationships are an important Vertex asset, and the confidential information that Vertex shared with Kritikos enabled her to interact effectively with KOLs in the field and ensure they were provided the most current information on Incivek and other Vertex developments.

### Kritikos's 2011 Promotion at Vertex

48.     To capitalize on Kritikos's standing in the hepatology community and in recognition of her performance, Vertex promoted her, in 2011, to her current position as Associate Director ("AD"), Field Medical of Vertex's West Region.  As an AD, Kritikos oversaw a staff of eight (8) MSLs located throughout the Western United States.  Specifically,

her territory included:  Alaska, Hawaii, Washington, Oregon, California, Idaho, Nevada, Arizona, Utah, Colorado, New Mexico, Nebraska, Kansas, Oklahoma, Texas, Minnesota, Iowa, Missouri, Arkansas, Louisiana, Michigan, Indiana, Kentucky, Ohio, West Virginia, eastern Pennsylvania and upstate New York.

49.    As an AD, Kritikos was responsible for ensuring that the eight (8) MSLs she supervised, understood, and advanced Vertex's field strategies for engaging KOLs, building relationships and maintaining Vertex's profile in the hepatology field.  Her duties included management tasks such as hiring and training and compensation and performance management.

### *Kritikos's Massachusetts-Based Work at Vertex*

50.    Because she was responsible for half the country, Kritikos regularly traveled and participated in meetings between MSLs and KOLs and/or clinicians.  During these meetings, Kritikos provided additional medical information and, after the meeting, gave the MSL performance feedback.

51.    Kritikos also participated in management meetings in Cambridge, MA.  These meetings involved important and confidential topics like setting national policies and strategies for the MSL field teams.  Strategies generally include identifying new KOLs and institutions, selecting sites for clinical trials, streamlining the content of clinical presentations and information to be shared with the public and with KOLs, and tailoring KOL engagement.

52.    In her current position as AD, Kritikos also serves as an MSL for Vertex to Northwestern University and the University of Chicago.

53.    Since her promotion in 2011, Kritikos has spent approximately 65 percent of her time managing the MSLs in the West Region, 20 percent of her time working with colleagues in

Massachusetts, and 15 percent of her time serving as an MSL to Northwestern and the University of Chicago.

54.     Because Vertex has no corporate office in Illinois, Kritikos traveled substantially to conduct business for Vertex.  When not traveling, she worked out of her home and made regular trips to Massachusetts to perform her job duties.

55.     As an AD, Kritikos reported to Robert C. Stevens, PharmD, Senior Director of Medical Affairs at Vertex ("Stevens").  Stevens is a field-based employee who devotes over half of his time to work at Vertex's corporate headquarters in Cambridge, MA.  In addition to daily email and text message conversations, Kritikos and Stevens held a weekly one-on-one telephone conference to discuss developments and field strategy predominately in the West Region.

56.     Each Stevens and Kritikos also engaged in a second weekly telephone call that included Debra Sieminski ("Sieminski"), Vertex's Associate Director for the East Region.  This call involved extensive discussions about national issues and the exchange of current, confidential Vertex information.

57.     Kritikos also participated in a third weekly teleconference among Stevens, Kritikos, Sieminski, and all sixteen (16) Vertex MSL's.  These calls also involved the exchange of confidential information about scientific issues, business objectives, and Vertex's strategic initiatives.

58.     Kritikos also interacted with numerous Vertex colleagues located at Vertex headquarters in Cambridge, MA on a nearly daily basis.  For example, she routinely communicated with Marybeth Maziarz, Vertex's Field Medical Team Coordinator.  She also was in almost daily contact with Shelley George, Kristy Grimm, and Kelli Edwards-Malone – a team dedicated to hepatitis C and Incivek therapeutic issues.

59. Kritikos communicated several times per week with a team dedicated to supporting speaker programs, advisory boards and trainings and with Cynthia Beam, who works at the Vertex corporate headquarters in Cambridge, MA.

60. Kritikos had regular conversations with colleagues to obtain updates on clinical developments, conferences, scientific information, and current hepatitis C materials. Although some of these discussions involved information that is available publicly, Kritikos routinely learned confidential Vertex information, and she regularly received copies (electronically and in hard copy) of documents that contain Vertex's most sensitive proprietary information.

61. Kritikos personally worked at Vertex's Cambridge location on a regular basis. On at least eighteen (18) days in the past year, she attended planning meetings, professional development seminars, and prepared for upcoming hepatology - related events and conferences. In many of these meetings, she received confidential and proprietary Vertex information.

*Kritikos's Access to Confidential Vertex Information*

62. By virtue of her position, Kritikos has had access to key data and non-public information about Incivek as well as other Vertex compounds in development. She also became well-versed in Vertex's national strategies, timetables for new drugs, and long term plans for later development.

63. In fact, before Kritikos informed Vertex that she was leaving, she attended the Vertex Annual Kick Off ("VAKO") meetings in San Diego. The VAKO meetings took place between January 20 and 24, 2013. Vertex's 2013 marketing strategies and financial information for drugs currently on the market were presented. Kritikos received highly sensitive information on the development phases for new compound research initiatives and clinical data. She received confidential information – including electronic copies – relating to Vertex's Medical

Strategic Plan, Medical Education Plan, real world compendium data on Incivek, and the MSL competency that was introduced at the VAKO meeting as a professional development tool for the MSLs.

64.     The information provided during these Company meetings was the most up-to-date and accurate confidential information about Vertex – financially, structurally and scientifically.  Access to this information would be invaluable to any of Vertex's competitors.

65.     As Kritikos sat in the VAKO meetings in San Diego, she accessed documents that were clearly marked, on every page, "Confidential – For Internal Purposes Only.  Not For Publication or Dissemination."  Despite the plainly marked confidentiality of these documents, she attached them to email messages that she sent out using her personal Yahoo email account. She also attached at least two separate USB drives to her Vertex laptop while she was participating in the VAKO meetings.

### *Vertex's Protection of its Confidential Information*

66.     At all times during her employment with Vertex, Kritikos has been aware of the confidential nature of the Vertex information with which she works.  Kritikos also is aware of the measures that Vertex undertakes to safeguard the confidentiality of its information, and to prevent disclosure of its proprietary information.

67.     Vertex has invested years of research and millions of dollars to attain and develop its confidential information, and it has implemented a number of limitations on access to that information to maintain its confidentiality.

68.     All of Vertex's computer networks are password protected, and each employee who requires access is given a unique password that must be changed every three months.  The

level of access each employee has to information on Vertex's network is limited to the information necessary for the employee to perform his or her job.

69.     Vertex employees are able to access Vertex's networks via company issued laptops and iPads as well as with software loaded onto their smartphones.  These devices also have the ability to store confidential information.  Accordingly, Vertex requires that all of these devices be password protected.

70.     Vertex also protects its confidential information by maintaining the ability to remove all information from (or "wipe") certain devices remotely.  For instance, pursuant to Vertex's Bring Your Own Device Policy, Vertex has the ability to completely wipe an employee's personal data assistant ("PDA"), such as a Blackberry or iPhone, if the PDA is lost or the individual's employment with the Company terminates.  Vertex also has the ability to wipe iPads that employees use to perform work for Vertex.

71.     On March 18, when Vertex informed Kritikos that she would not be required to perform any further work for Vertex and that she would be on leave through March 29, Vertex wiped her personal PDA and the Vertex iPad in her possession.

72.     Although Vertex can remotely wipe PDAs and iPads, it is not able to wipe confidential information from Vertex-issued laptops like the one Kritikos used as a Vertex employee.

73.     Vertex has a practice of limiting the extent to which non-public information is printed in hard copy so as to prevent disclosure.  For example, printed handouts are rarely distributed even at internal meetings and presentations where confidential information may be shared.  Those materials and presentation slides that do contain confidential information are marked confidential.

74. Vertex also has physical security protocols for its Cambridge, Massachusetts headquarters. Visitors are required to identify themselves at the main entrance and wear security badges identifying them as visitors. They also are accompanied by Vertex staff at all times. Certain sensitive areas of Vertex's facilities are locked and require keypad access.

75. When interviewing candidates for positions that require access to Vertex's confidential and proprietary information, Vertex requires that candidates sign a confidentiality agreement. In consideration to Vertex's sharing of confidential information with the candidate so that the candidate may be considered for employment, the candidate agrees that he or she "shall use the Confidential Information solely for [my candidacy], and will hold in strict confidence and not disclose to any third party any confidential information. The obligations of Candidate receiving under this Agreement shall commence on the Effective Date and shall continue in full force and effect for five years." *See* Exhibit 6, at ¶2 Confidentiality Agreement.

76. Kritikos signed the Confidentiality Agreement when she interviewed with Vertex on October 3, 2007. *Id.* Thus, even before her employment began, Kritikos was aware of the serious measures in place to protect Vertex's confidential and proprietary information.

77. Based on the above-referenced agreements, policies, and practices protecting Vertex's confidential information, Vertex permitted Kritikos to access Vertex's confidential and proprietary information for the limited purpose of performing her job at Vertex.

### *Kritikos Inevitably Will Use Vertex's Confidential Information at Gilead*

78. Since it was approved by the U.S. Food and Drug Administration in May of 2011, Incivek has been a treatment of choice for patients suffering from hepatitis C. It is an inhibitor of the hepatitis C Genotype 1 and, when combined with pegylated interferon and ribavirin, it prevents further replication of viral cells, resulting in a cure.

79.     Gilead has yet to market a drug for the treatment of hepatitis C.  Upon information and belief, however, Gilead will seek FDA approval of a new drug, sofosbuvir, within the next year.  If approved by the FDA, sofosbuvir would compete directly with Vertex's Incivek.

80.     As an MSL for Gilead, Kritikos's in-depth knowledge of confidential and proprietary information about Incivek will place Gilead at an unfair advantage.

81.     Inevitably, she will use the relationships she has fostered with KOLs while working at Vertex to compare sofosbuvir to Incivek.

82.     In addition, because she has been privy to non-public regulatory information and she is intimately familiar with Vertex's strategic framework for engaging KOLs about Incivek. For instance, she has proprietary compilations of information about those KOLs whom Vertex has yet to reach and those with whom it currently has established relationships.

83.     No matter what area of hepatology Gilead assigns to Kritikos – whether hepatitis B or C – Kritikos inevitably will use and disclose Vertex's confidential information if she works in the competitive role she has accepted at Gilead.

84.     Although the therapies for hepatitis B and hepatitis C differ, the KOLs and clinicians in the field are the same because they usually cover the field of hepatology generally.

85.     Although both hepatitis B and hepatitis C are both diseases of the liver, they are caused by different virus strains and require different treatments.  Hepatitis B is transmitted by exposure to infected bodily fluids such as blood or semen – usually through sexual contact, the sharing of needles, and in some cases passage from mother to child.  Hepatitis B is preventable by vaccine.  Hepatitis C is spread through contact with an infected person's blood, and unlike

with hepatitis B, those with acute hepatitis C are more likely to develop chronic hepatitis C, which can ultimately lead to cirrhosis of the liver and cancer.  There is no vaccine for hepatitis C.

86.     At Gilead, Kritikos still will interact with *the same* KOLs and clinicians in hepatology that she interacted with at Vertex, and she inevitably will be drawn into discussions that compromise the confidentiality of Vertex's proprietary information.

87.     Kritikos's proposed Gilead territory will be a subset of her former Vertex territory.  It is inevitable that, during these interactions with KOLs and clinicians, who know Kritikos's involvement with Incivek, she may be asked questions about Incivek within the scope of her discussions regarding sofosbuvir.  Therefore, Kritikos's knowledge of confidential, non-public information undoubtedly will compromise Vertex's confidential information to the improper and unfair advantage of Gilead.

88.     Additionally, Vertex is currently developing a new class of hepatitis C treatments aimed at continuing its competitive place in the treatment market, and Kritikos is aware of the latest developments in Vertex's next drugs for the treatment of liver disease.  This information is highly sensitive and includes the most recent trial data, regulatory communications, identification of KOLs – both current and future – who are performing clinical trials for Vertex. It also included Vertex's timetable for development, regulatory approval, and ultimate release of any new treatments.  This research, development, and KOL engagement information would be extremely valuable to any of Vertex's competitors.

89.     Kritikos also knows sensitive internal information about Vertex management, personnel, and field structure as well as Vertex's long term plans for the engagement of KOLs and selection of clinical trial sites for new Vertex drugs.  Gilead unquestionably will capitalize on this information.

### *Kritikos's Suspicious Pre-Departure Activities*

90.     By November 6, 2012, Kritikos already had begun planning to meet with Bill

Guyer, Gilead's Vice-President, Medical Affairs for Antivirals.  Over the next eighteen (18)

weeks, Kritikos continued to receive, learn, and stockpile Vertex's most confidential

information.

91.     For instance, between January 20 and 24, 2013, while communicating with

Gilead, Kritikos participated in Vertex's annual VAKO conference.  At this event she learned the

most current status of all facets of Vertex's commercial, scientific and internal endeavors – a

treasure trove of highly confidential information for any of Vertex's competitors.

92.     In addition to continuing to obtain, learn, and save Vertex's most current and

highly confidential information in the over four-month period between commencing

communications with Gilead and returning her laptop and other Vertex property to Vertex,

Kritikos:

      (a)     Sent to her personal Yahoo email address confidential Vertex documents that she received during VAKO (and which were clearly marked "CONFIDENTIAL – FOR INTERNAL TRAINING PURPOSES ONLY.  NOT FOR PUBLICATION OR DISSEMINATION" on every page);

      (b)     Attached to her Vertex laptop computer, which contained numerous confidential Vertex documents, at least ten (10) separate thumb drives (each of which likely had the storage capacity of over 10 compact discs) and one external hard drive (with the capacity to store 320 Gigabytes – or approximately 500 compact discs full – of data);

      (c)     Failed to return to Vertex even one of the eleven (11) external storage devices referenced in the prior Paragraph;

(d)     Informed Julie Hubbard, Associate Director of
Human Resources at Vertex, during a phone
conversation on March 21, 2013, that she had, on
March 18, 2013 returned to Vertex all Vertex
property and all copies of Vertex information in her
possession.

93.     In addition to failing to provide Vertex with all of the external storage devices that

she attached to the Vertex laptop, Kritikos used the Vertex laptop to attach confidential Vertex

documents to emails that she sent from her personal Yahoo account.  She sent several such

messages just days after announcing her decision to resign and within hours after learning that

Vertex had (a) decided to place her on a paid leave through March 29, 2013 and (b) sent a

courier to her home to retrieve all of the Vertex property in her possession.

94.     For example, the forensic analysis of the Vertex laptop shows that she attached

confidential personnel information about current Vertex MSLs whom she supervised to an email

message that she sent from her Yahoo account at 3:49:09 p.m. Central Time on March 18, 2013.

95.     Kritikos misappropriated this confidential information even though Vertex had

informed her on March 18, at approximately 10:30 a.m. Central Time, that she was to cease all

work for Vertex.

96.     Despite this instruction, Kritikos thereafter downloaded competency and

performance information for five (5) of the eight (8) MSLs she supervised in the West Region.

She also downloaded a copy of one MSL's retention bonus letter.  After downloading that

information, she attached it to email messages she sent from her personal Yahoo account

between 3:43 and 3:49 p.m. Central Time.  As someone who had been instructed to stop

performing Vertex work, Kritikos had no legitimate business reason to access – let alone

transmit – this confidential Vertex information.

97.     Notably, many of the MSLs whose confidential information Kritikos downloaded currently provide scientific support to Vertex in territories where public records reveal Gilead is actively seeking to hire MSLs.

98.     Upon information and belief, Kritikos's dissemination of this confidential information via her personal email account is evidence of her effort to (a) recruit MSLs away from Vertex and (b) conspire with Gilead to promote sofosbuvir.

99.     Taking Vertex's confidential personnel information for the benefit of Gilead constitutes a breach of Kritikos's fiduciary obligation to Vertex.

100.    The active recruitment of Vertex MSLs to assist Gilead in competing directly with Vertex is a material breach of the non-solicitation provisions of the Agreement and would harm Vertex's relationships with KOLs in the hepatology community.

101.    These relationships have taken years to develop, and the ability for Vertex to develop and eventually market new drugs depends on its ability to engage KOLs and recruit them to conduct clinical trials.

102.    As an MSL at Gilead, Kritikos inevitably will use and/or disclose Vertex's highly confidential and proprietary information to Gilead's benefit and Vertex's detriment.

103.    If Kritikos breaches the Agreement and commences employment with Gilead, a direct competitor with Vertex in the field of hepatology, it will compromise Vertex's confidential business and scientific information.  Kritikos and Gilead will tortiously interfere with Vertex's valuable relationships with KOLs in the hepatology field.

## FIRST CAUSE OF ACTION
### Breach of Contract
### (v. Kritikos)

104.    The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

105.    The Agreement is an enforceable agreement supported by consideration and governed by the laws of the Commonwealth of Massachusetts.

106.    Vertex performed its obligations to Kritikos under Kritikos's offer letter, May 5, 2011 promotion agreement and the July 26, 2012 retention bonus agreement.

107.    By engaging in the conduct described above, Kritikos has violated her contractual obligations to Vertex.  Her breaches include, but are not limited to:

    a.    accepting employment with Gilead, a direct competitor in the hepatology field without first obtaining Vertex's prior written consent;

    b.    taking steps to assist Gilead in recruiting other current Vertex employees; and

    c.    using and/or disclosing Vertex confidential and proprietary information.

108.    As a direct and proximate result of Kritikos's violations of her contractual obligations to Vertex, Vertex has suffered and will continue to suffer irreparable harm and monetary damages.

## SECOND CAUSE OF ACTION
### Intentional Interference with Contractual
### and Advantageous Business Relations
### (v. Kritikos and Gilead)

109.    The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

110.    Vertex enjoyed contractual and/or advantageous business relationships with KOLs and others in the hepatology field, Kritikos and other Vertex employees.

111.    Kritikos has personal knowledge of such advantageous relationships.

112.    Gilead has actual knowledge of Kritkos's contractual obligations to Vertex.

113.    Gilead is aware of Vertex's advantageous relationships with KOLs and others in the hepatology field.

114.    Despite actual knowledge of the above-referenced advantageous and contractual relationships, Kritikos has and intends to continue knowingly, maliciously and in bad faith, interfere with Vertex's advantageous relationships with its employees, KOLs and others in the hepatology field.

115.    Despite actual knowledge of the above-referenced advantageous and contractual relationships, Gilead has and is likely to continue to knowingly, maliciously and in bad faith interfere with Vertex's contractual relationships with Kritikos, other Vertex employees, KOLs, clinicians, and others in the hepatology field.

116.    As a direct and proximate result of Defendants' misconduct, Vertex has suffered and will continue to suffer irreparable harm and monetary damages.

**THIRD CAUSE OF ACTION**
**Misappropriation of Confidential Information In Violation Of**
**the Common Law and of Mass. G.L. c. 93, § 42**
**(v. Kritikos)**

117.    The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

118.    As more fully described in the paragraphs above, Kritikos acquired confidential Vertex information while working for Vertex.

119.    Vertex takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its confidential, proprietary, and trade secret information.  Therefore, Vertex's confidential, proprietary, and trade secret information is not known outside of Vertex.

120.    Vertex has expended significant financial and other resources in developing its confidential, proprietary, and trade secret information, all of which are extremely valuable to Vertex.

121.    Kritikos knew that the use or disclosure of Vertex's trade secret and confidential information for any purpose other than for the benefit of Vertex was prohibited.

122.    Kritikos used and disclosed, continue to use and disclose, or inevitably will use and disclose, Vertex's confidential, proprietary, and trade secret information for the benefit of herself, without Vertex's express or implied consent.

123.    As a result of Kritikos's misappropriation of Vertex's confidential, proprietary, and trade secret information, Vertex has suffered and will continue to suffer irreparable harm and monetary damages.

124.    All, or substantially all, of Vertex's confidential, proprietary and trade secret information that Kritikos has unlawfully misappropriated and disclosed originated from Massachusetts.

125.    The harm suffered by Vertex occurred within the Commonwealth of Massachusetts.

### FOURTH CAUSE OF ACTION
**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.***
**(v. Kritikos)**

126.    The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

127.    The data network on which Vertex maintained and currently maintains its proprietary, confidential, and trade secret information in electronic form is a network of computers used in interstate commerce.

128.   During her employment with Vertex, Kritikos was authorized by Vertex to use its computers, and to access its network, only for the purpose of performing work on behalf of Vertex.

129.   Once Kritikos notified Vertex of her intent to leave for Gilead, Kritikos had no reason whatsoever to access Vertex's confidential personnel information.

130.   Kritikos never was authorized to transfer Vertex's property or its proprietary, confidential, or trade secret maintained by Kritikos or used for the benefit of herself or any other person or entity.

131.   Upon information and belief, Kritikos accessed some or all of the contents of Vertex's secure data network with the intent to defraud Vertex and recruit Vertex employees to the benefit of Gilead.

132.   Upon information and belief, Kritikos improperly has retained at least 11 external storage devices that she attached to Vertex's computer in excess of her authority to access Vertex's computers and network.

133.   By means of her conduct described above, Kritikos furthered her intended fraud and took Vertex's confidential personnel information.

134.   By means of her conduct described above, Kritikos intentionally accessed Vertex's computers and computer network without or in excess of her authorization, and as a result of such conduct, caused damage and loss to Vertex.

135.   Kritikos violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*, by her conduct described above.

136.   Kritikos engaged in the conduct described above for her own personal benefit, and for the benefit of Gilead, which is a competitor of Vertex.

137.    Vertex has suffered monetary damage and loss by reason of, and as a proximate result of the conduct in violation of the Computer Fraud and Abuse Act described above, and the value of such loss to Vertex exceeds $5,000.00 for a one-year period.

### FIFTH CAUSE OF ACTION
**Breach of Fiduciary Duty of Loyalty**
**(v. Kritikos)**

138.    The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

139.    Kritikos worked for Vertex in a managerial capacity as an AD at Vertex, and she owed to Vertex a duty of fidelity, and utmost good faith and fair dealing.

140.    Kritikos, as an AD at Vertex, was exposed to Vertex's most intimate confidential and proprietary and trade secret information, occupied a position of trust and confidence at Vertex, and was obligated to protect Vertex's interests.

141.    As an AD at Vertex, Kritikos was granted substantial access to Vertex's confidential and proprietary and trade secret information, and she owed fiduciary obligations, including the duty of loyalty, to Vertex.

142.    Kritikos had a fiduciary duty of loyalty and she breached it while employed by Vertex by acting in a manner that conflicted with, and affirmatively undermined, Vertex's business interests.

143.    Kritikos breached her fiduciary duty of loyalty to Vertex (a) by gathering confidential Vertex information for the purpose of advancing the business interests of Gilead, a competitor to Vertex, and (b) by taking steps to advance the business interests of Gilead while employed by Vertex and while being compensated by Vertex.

144.    Kritikos breached her fiduciary duty of loyalty to Vertex by gathering confidential personnel information about Vertex MSLs so she can use that information to assist Gilead in

recruiting Vertex employees.  In doing so, Kritikos has harmed Vertex's interests in retaining its employees and Vertex will suffer damages as a result.

145.    As a direct and proximate result of Kritikos's breaches of her fiduciary duty of loyalty to Vertex, Vertex has suffered and will continue to suffer irreparable harm, including actual loss.

## SIXTH CAUSE OF ACTION
### Unfair and Deceptive Trade Practices, M.G.L. c. 93A, §§ 2 & 11
### (v. Gilead)

146.    The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

147.    At all times relevant to this action, Gilead has been engaged in trade or commerce within the meaning of M.G.L. c. 93A, §§ 2 and 11.

148.    Gilead has engaged in unfair and deceptive trade practices by endeavoring to obtain and use Vertex's confidential and proprietary and trade secret information, despite its actual knowledge that (i) such information was unlawfully obtained, and (ii) Vertex's former employee who intends to work for Gilead will violate her post-employment obligations to Vertex if she commence employment with Gilead.

149.    Gilead has engaged in unfair and deceptive trade practices intentionally, knowingly, and willfully seeking to acquire and misuse Vertex's confidential and proprietary information, and to solicit Vertex's current, former, and prospective customers and employees despite its actual knowledge that Vertex's employees could not work for Gilead without breaching their contractual obligations to Vertex.

150.    The unfair and deceptive trade practices engaged in by Gilead occurred and continue to occur primarily and substantially within the Commonwealth of Massachusetts.

151.    The actions of Gilead constitute unfair and deceptive trade practices in violation of M.G.L. c. 93A, §§ 2 and 11.

152.    As a direct and proximate result of Gilead's unfair and deceptive conduct, Vertex has suffered and will continue to suffer irreparable harm, including actual loss.

**SEVENTH CAUSE OF ACTION**
**Fraud by Deceit**
**(v. Kritikos)**

153.    The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

154.    When Kritikos was in the process of returning all of the Vertex property then in her possession, including her laptop and iPad, Kritikos misrepresented to Vertex that she had returned all of Vertex's confidential information when in fact she failed to return ten (10) thumb drives and an external hard drive and had emailed to her personal yahoo account Vertex's confidential proprietary and personnel information. In engaging in these measures to conceal each of these activities from Vertex, Kritikos actively deprived Vertex of the value of her fair and honest services.

155.    By concealing her efforts in furtherance of the interests of Gilead, Kritikos sought to ensure that Vertex would continue to allow her access to Vertex's most valuable confidential information.

156.    The salary payments made to Kritikos in the period during which she was planning to leave Vertex for Gilead and accessing Vertex's confidential information for the benefit of Gilead were induced through fraud.

157.     Beginning in November 2012, Kritikos intended that, by withholding information about her intent to join Gilead, she would induce Vertex to provide her with ongoing salary payments.

158.     Kritikos was a fiduciary of Vertex, *inter alia*, by nature of her managerial role and her access to Vertex's confidential information.  By virtue of the extensive access granted by Vertex to Kritikos of Vertex's most intimate, competitively sensitive, and commercially valuable confidential information, Kritikos was a Vertex fiduciary, and owed to Vertex an obligation of utmost candor, good faith, and fair dealing.

159.     As a direct and proximate result of Kritikos's fraud, Vertex has suffered and will continue to suffer irreparable harm, including actual loss.

### EIGHTH CAUSE OF ACTION
**Conversion of Vertex Property**
**(v. Kritikos)**

160.     The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

161.     Through their wrongful conduct, Kritikos assumed and exercise ownership rights over Vertex property, including, without limitation, Vertex information stored on the eleven (11) external storage devices referenced in Paragraphs __ above.

162.     This exercise of ownership rights was done without the authority of Vertex.

163.     Kritikos's unauthorized exercise and assumption of ownership rights over Vertex's property is to the exclusion of Vertex's right in that property.

164.     As a direct and proximate result of Defendants' conduct, Vertex has suffered irreparable harm, including actual loss.

## NINTH CAUSE OF ACTION
### Civil Conspiracy
### (v. Gilead and Kritikos)

165.    The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

166.    Defendants Gilead and Kritikos engaged in a common plan to steal Vertex's valuable confidential information, and to use the Vertex confidential information to unlawfully compete with Vertex and to interfere with Vertex's customer relationships.

167.    Defendants Gilead and Kritikos engaged in a common plan to defraud Vertex and to obstruct justice through the concealment of their joint plans to engage in business operations at Gilead.

168.    Defendants Gilead and Kritikos were aware of the common plan and were aware of the common purpose:  to steal Vertex's confidential information, to use the Vertex confidential information to unlawfully compete with Vertex and to interfere with Vertex's customer relationships, and to fraudulently conceal their unlawful acts from Vertex.

169.    Although Gilead and Kritikos acted in concert, agreed, and cooperated to achieve the theft and use of confidential information, the interference with important business relationships, and the fraudulent concealment of their unlawful acts, each took affirmative steps to encourage the achievement of their plan.

170.    As a direct and proximate result of Defendants' conspiratorial conduct, Vertex has suffered irreparable harm, including actual loss.

### TENTH CAUSE OF ACTION
**Injunctive Relief**
**(v. Gilead and Kritikos)**

171.    The allegations in the preceding paragraphs are incorporated as though fully set forth herein.

172.    The Agreement is supported by consideration.

173.    In direct violation of the confidentiality protections and restrictive covenants in the Agreement, Kritikos accepted employment with Gilead.

174.    Vertex has no adequate remedy at law.  Furthermore, Vertex's irreparable harm and damages are ongoing.

175.    Vertex is entitled to an injunction enforcing the covenants in the Agreement. Specifically, Vertex is entitled to an injunction preventing Kritikos from commencing employment with Gilead.

176.    Vertex also is entitled to an injunction that requires the immediate return of all of Vertex's confidential information and all other Vertex property of any sort.

### PRAYERS FOR RELIEF

WHEREFORE, Plaintiff Vertex respectfully requests that the Court:

A.      Order that Defendants be permanently enjoined from disclosing, using, or providing to any third party any of Vertex's confidential, proprietary, or trade secret information;

B.      Order that Defendants immediately return to Vertex all originals and all copies, electronic or otherwise, of all Vertex's confidential, proprietary, or trade secret information in their possession, custody, or control;

C.      Order that Defendants be permanently enjoined from interfering with Vertex's relationships with its current or potential KOLs and/or clinicians and others in the hepatology

field about which Kritikos had knowledge or obtained confidential information during her employment with Vertex;

      D.      Enter judgment in Vertex's favor on each cause of action set forth above;

      E.      Award Vertex monetary damages in an amount to be proven at trial, for the economic injury it has sustained as a consequence of Defendants' actions;

      F.      Award Vertex treble damages and attorneys' fees for Gilead's violation of Mass. G.L. c. 93A;

      G.      Award Vertex double damages for Defendants' violations of Mass. G.L. c. 93, § 42; and

      H.      Award Vertex such equitable relief as is just and proper.

**JURY DEMAND**

Vertex demands a jury trial on all claims so triable.

                  Respectfully submitted,

                  **VERTEX PHARMACEUTICALS INCORPORATED**

                  By its Attorneys,

                  /s/ Danielle Y. Vanderzanden
                  Danielle Y. Vanderzanden (BBO #563933)
                  Todd M. Torres (BBO #681779)
                  Ogletree, Deakins, Nash,
                      Smoak & Stewart, P.C.
                  One Boston Place, Suite 3220
                  Boston, MA  02108
                  Telephone:  (617) 994-5700
                  Facsimile:  (617) 994-5701
                  dani.vanderzanden@ogletreedeakins.com
                  todd.torres@ogletreedeakins.com

Dated:  March 27, 2013

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Danielle Y. Vanderzanden
Danielle Y. Vanderzanden

14666131.1